UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND LEON JOHNSON,<br><br>        Plaintiff,<br><br>    v.<br><br>SHANKARI REDDY,<br><br>        Defendant. | No. 2:12-cv-1843 KJN P<br><br><br>ORDER |

I. Introduction

     Plaintiff is a state prisoner, proceeding without counsel and in forma pauperis, with an action filed pursuant to 42 U.S.C. § 1983. All parties have consented to proceed before the undersigned for all purposes. See 28 U.S.C. § 636(c). This case is proceeding on plaintiff's second amended complaint against defendant Dr. Reddy.[1] Pending before the court is defendant Reddy's motion to dismiss these claims based on plaintiff's alleged failure to plead facts sufficient to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). After careful review of plaintiff's pleadings, and the documents submitted therewith, the court finds that defendant's motion to dismiss is granted, and this case is closed.

////

---

[1] Defendants Torruella and Jeu were dismissed based on plaintiff's failure to exhaust his administrative remedies. (ECF No. 8.)

II. <u>Second Amended Complaint</u>

Plaintiff claims that defendant Dr. Reddy was deliberately indifferent to plaintiff's serious medical needs. Plaintiff alleges that Dr. Jeu and Dr. Torruella injected plaintiff's scalp with cortisone shots which allegedly aggravated plaintiff's keloid[2] bumps, causing swelling, severe pain, permanent hair loss, scarring, weeping, and irritation. Plaintiff alleges that his requests for medical care to correct these issues were ignored by Dr. Reddy.

Plaintiff alleges that defendant Dr. Reddy refused to treat plaintiff's allegedly worsening medical condition following the treatments provided by Drs. Jeu and Torruella, and that Dr. Reddy also refused to treat plaintiff's severe back pain resulting from a gunshot wound that left a pellet of the bullet lodged in plaintiff's spine. Plaintiff states that Dr. Reddy "ridiculed" plaintiff, and "ignored his pain and suffering." (ECF No. 25 at 4.) Plaintiff claims defendant "did not offer any palliative measures, treatment options or possible referrals to treatment specialists," and "did not offer any pain medications until May 18, 2011, over eight months after plaintiff's original request for treatment." (ECF No. 25 at 4.)

III. <u>Defendant's Motion to Dismiss</u>

Defendant moves to dismiss the second amended complaint because the documents referenced in plaintiff's pleadings demonstrate that Dr. Reddy provided medically appropriate care. (ECF No. 26-1 at 3.) Defendant argues that plaintiff's new contentions that Dr. Reddy misdiagnosed plaintiff's folliculitis as keloids, and failed to refer plaintiff to a dermatologist rather than personally treat plaintiff, fail to demonstrate deliberate indifference. Plaintiff filed an opposition,[3] and defendant filed a reply. On November 18, 2013, plaintiff filed a sur-reply, which

---

[2] A keloid is defined as "[a] nodular, firm, movable, nonencapsulated, often linear mass of hyperplastic scar tissue, tender and frequently painful, consisting of wide irregularly distributed bands of collagen; occurs in the dermis and adjacent subcutaneous tissue, usually after trauma, surgery, a burn, or severe cutaneous disease such as cystic acne, and is more common in blacks." STEDMAN'S MEDICAL DICTIONARY 216510 (27th ed. 2000).

[3] It appears that in plaintiff's opposition he attempted to renew his claim that Dr. Reddy violated the California Penal Code. However, such claim was not included in plaintiff's second amended complaint. Moreover, as set forth in the June 17, 2013 order, plaintiff's amended complaint failed to state a cognizable claim under the California Penal Code. (ECF No. 22 at 3.)

1   is not authorized under Local Rule 230(l), and was not ordered by the court.  Nevertheless, the
2   court considered plaintiff's arguments therein.

3   IV.  <u>Legal Standard</u>

4       Rule 12(b)(6) of the Federal Rules of Civil Procedures provides for motions to dismiss for
5   "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In
6   considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court
7   must accept as true the allegations of the complaint in question, <u>Erickson v. Pardus</u>, 551 U.S. 89
8   (2007), and construe the pleading in the light most favorable to the plaintiff.  <u>Jenkins v.
9   McKeithen</u>, 395 U.S. 411, 421 (1969); <u>Meek v. County of Riverside</u>, 183 F.3d 962, 965 (9th Cir.
10  1999).  Still, to survive dismissal for failure to state a claim, a pro se complaint must contain more
11  than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a
12  cause of action."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555-57 (2007).  In other words,
13  "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory
14  statements do not suffice."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  Furthermore, a claim
15  upon which the court can grant relief must have facial plausibility.  <u>Twombly</u>, 550 U.S. at 570.
16  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to
17  draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 129
18  S. Ct. at 1949.  Attachments to a complaint are considered to be part of the complaint for
19  purposes of a motion to dismiss for failure to state a claim.  <u>Hal Roach Studios v. Richard Feiner
20  & Co.</u>, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

21      A motion to dismiss for failure to state a claim should not be granted unless it appears
22  beyond doubt that the plaintiff can prove no set of facts in support of his claims which would
23  entitle him to relief.  <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).  In general, pro se
24  pleadings are held to a less stringent standard than those drafted by lawyers.  <u>Haines v. Kerner</u>,
25  404 U.S. 519, 520 (1972).  The court has an obligation to construe such pleadings liberally.  <u>Bretz
26  v. Kelman</u>, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (*en banc*).  However, the court's liberal
27  interpretation of a pro se complaint may not supply essential elements of the claim that were not
28  pled.  <u>Ivey v. Bd. of Regents of Univ. of Alaska</u>, 673 F.2d 266, 268 (9th Cir. 1982).

V. <u>Discussion</u>

    A. <u>Medical Indifference</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  An individual may be liable for deprivation of constitutional rights "within the meaning of section 1983 'if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'"  <u>Preschooler II v. Clark County Sch. Bd. of Trs.</u>, 479 F.3d 1175, 1183 (9th Cir. 2007).  Thus, the statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct).

    In order to state an Eighth Amendment claim for inadequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).  Plaintiff must plead sufficient facts to permit the court to infer that (1) plaintiff had a "serious medical need," and that (2) individual defendants were "deliberately indifferent" to that need.  <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006).  A prisoner can satisfy the "serious medical need" prong by demonstrating that "failure to treat [his] condition could result in further significant injury or the unnecessary and wonton infliction of pain."  <u>Id.</u> (internal citations and quotations omitted).  Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference."  <u>Jett</u>, 439 F.3d at 1096 (citation omitted).  In order to state a claim for violation of the Eighth Amendment, a plaintiff must allege sufficient facts to support a

////

4

claim that the named defendants "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health. . . ." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06.) A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Also, "a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a[§ ]1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). To establish that such a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

B. Administrative Appeals and Medical Records

Plaintiff appended documents to the second amended complaint, as well as earlier complaints, which describe the following medical care provided to plaintiff.

On July 27, 2010, plaintiff presented with "a longstanding keloid on the back of his neck," and "for an injection of a steroid to see whether it will improve his condition." (ECF No. 25 at 27.) Dr. Joseph Torruella noted that plaintiff had not previously had a steroid injection, and that the "lesion does not cause pain." (Id.) However, the lesion was described as "quite unsightly and results in a hair loss overlying the [keloid]." (Id.) Plaintiff was provided with subsequent

////

injections of steroids by Dr. Torruella and Dr. Jeu. (ECF No. 25 at 28-29.) Dr. Torruella diagnosed plaintiff's condition as a "scalp keloid." (ECF No. 25 at 29.)

On January 31, 2011, plaintiff completed a Health Care Services Request Form, complaining that a large red bump appeared on his neck on January 20, 2011, which was still there; the large keloid bumps on the lower back of his scalp was "bleeding badly and getting worse," and that he had been feeling "severe pain in [his] lower back area." (ECF No. 25 at 33.) The triage nurse noted that plaintiff claimed the "keloid" on the back of head "has been hurting and occasionally bleeding." (ECF No. 25 at 33.) Plaintiff reported that he had the keloid for 10 years. (Id.) The back pain was increasing lately. (Id.) The triage nurse diagnosed plaintiff with a "keloid mass" on his head, and referred plaintiff to the doctor. (Id.) Plaintiff was advised as to "routine skin/back care." (Id.)

On February 10, 2011, plaintiff was examined by defendant Dr. Reddy, who noted that plaintiff was seen for keloid follow-up, bumps popping up on plaintiff's right forearm, and lower back pain the past few days. (ECF No. 25 at 30.) Dr. Reddy noted that plaintiff had small red lesions on the forearm, but plaintiff denied itching. Plaintiff also denied incontinence or weakness of extremities. (Id.) Dr. Reddy assessed plaintiff's lower back, noting that plaintiff's gait was steady. (ECF No. 25 at 30.) Dr. Reddy charted that there was no bleeding noted at the keloid site. (Id.) Dr. Reddy diagnosed plaintiff with lower back pain, noting plaintiff was prescribed Ibuprofin for pain, and "check x-ray." (ECF No. 25 at 30.) Plaintiff was diagnosed with an occipital keloid, and noted "conservative treatment." (Id.) Finally, Dr. Reddy diagnosed plaintiff with folliculitis[4] of his right forearm, and advised plaintiff to keep the area clean and dry, and to return if it got worse. (Id.) Under education, Dr. Reddy noted "medical compliance," and diet and exercise. (ECF No. 25 at 30.)

On February 15, 2011, plaintiff received an x-ray of his lumbosacral spine. (ECF No. 8 at 23.) The x-ray was ordered on February 10, 2011. (ECF No. 8 at 34.)

////

---

[4] Folliculitis is defined as "[a]n inflammatory reaction in hair follicles; the lesions may be papules or pustules." STEDMAN'S MEDICAL DICTIONARY 152470 (27th ed. 2000).

On March 4, 2011, Dr. Reddy saw plaintiff in connection with his appeal. (ECF No. 25 at 31.) Plaintiff was evaluated for red bumps on his upper extremities, and plaintiff was referred for minor surgery for a cyst in his left axilla or forearm. (ECF No. 25 at 31.) Dr. Reddy noted that plaintiff's condition did not affect his activities of daily living. Plaintiff's occipital keloid showed no signs of active infection. (ECF No. 25 at 31.) Dr. Reddy diagnosed plaintiff's "occipital keloid," noted it was caused by the three steroid injections, but that no plastic surgery was indicated at this time, only observation. (ECF No. 25 at 31.) Plaintiff's back was examined, and his range of motion and heal/toe were noted as within normal limits. (Id.) His gait was steady. (Id.) Dr. Reddy noted that the x-ray of plaintiff's lower back, ordered February 10, 2011, was "pending report," and further noted Ibuprofen, and back care. (ECF No. 25 at 31.) Under education, Dr. Reddy noted "medical compliance," and handwashing. (Id.) Subsequently, Dr. Reddy reviewed the x-ray report, and noted Tylenol was prescribed as "drug of choice." (ECF No. 25 at 31.)

On April 27, 2011, plaintiff met with Dr. Reddy in connection with the second level appeal, who noted that plaintiff indicated his armpit cyst had disappeared, and plaintiff stated he no longer needed minor surgery. (ECF No. 25 at 15, 20.) Dr. Reddy noted that there was no medical indication for plaintiff to be seen by plastic surgery for the keloid occipital area. (ECF No. 25 at 15.) Dr. Reddy discussed with plaintiff his chronic low back pain, the x-ray results, and back care, stretching, exercises, injury prevention and pain goals. (ECF No. 25 at 15-16.) Plaintiff was prescribed Ibuprofen as needed for pain. (ECF No. 25 at 16.)

On May 16, 2011, plaintiff submitted a health care services request form, seeking evaluation for severe back pain which was getting worse, and the Ibuprofen wasn't working, and the bleeding keloid bumps on the back of his neck was getting worse. (ECF No. 25 at 34.) Plaintiff was seen by the triage nurse on May 17, 2011, evaluated, and prescribed naproxen, and referred to his primary care physician for an appointment on May 23, 2011. (Id.)

On May 23, 2011, plaintiff was prescribed triamcinolone acetonide cream to control the bleeding keloid bumps. (ECF No. 25 at 14.) Plaintiff was prescribed naproxen and methocarbamol for his back pain. (ECF Nos. 25 at 18; 8 at 21; 23.)

7

1    On June 24, 2011, plaintiff filed a second level appeal, noting that the cream did not work
2    to stop the bleeding or lessen the large keloid bumps. (ECF No. 25 at 14.)
3    Plaintiff was examined on August 23, 2011, and medical records indicated that plaintiff's
4    back was non-tender and straight leg raises were negative, and that Ibuprofen and nortriptyline
5    were prescribed for plaintiff's pain. (ECF No. 25 at 21.)
6    Plaintiff's comprehensive accommodations chrono provided for a bottom bunk, lower tier,
7    and physical limitations, and the pharmacy profile reflected prescription medications for
8    neuropathic pain and allergies. (Id.)
9    On March 13, 2012, plaintiff submitted a health care services request form, seeking
10   treatment for the bleeding of his occipital keloid. (ECF No. 25 at 35.) Plaintiff stated that the
11   triamcinolone acetonide cream and the hydrocortisone cream were not stopping the severe pain
12   and bleeding. (Id.) Plaintiff sought renewal of medication for his back pain. (Id.) Plaintiff was
13   examined by the triage nurse and advised to continue medications as prescribed, and to follow
14   education and treatment plan. Plaintiff was scheduled to see his primary care provider in two
15   weeks. (Id.)
16   On May 26, 2012, plaintiff submitted a health services request form requesting medicine
17   for his bleeding keloids and a refill of the Ibuprofen prescription for his back pain. (ECF No. 25
18   at 36.) On May 27, 2012, the triage nurse reported that plaintiff stated he has had keloids on the
19   back of his head since 1990, that it was itching and he started to scratch, causing it to bleed. (Id.)
20   It stopped bleeding now. (Id.) Plaintiff complained of itching and was scratching it with a comb
21   during the medical visit. (Id.) Plaintiff had no current medications for the lesion, and denied pain
22   or headache. (Id.) Plaintiff was instructed to maintain good hygiene; apply pressure dressing if
23   bleeding recurs; avoid rubbing, chafing or scratching the keloids; and to use a cool washcloth to
24   decrease itching. (Id.) Plaintiff's prescription for Ibuprofen for back pain was renewed. (Id.)
25   On November 6, 2012, the Diagnostic Pathology Medical Group, Inc., performed a "skin,
26   scalp, punch biopsy" on plaintiff's tissue, and diagnosed as having a "ruptured folliculitis with
27   granulation tissue, acute and chronic inflammation, and diffuse scarring fibrosis." (ECF No. 25 at
28   38.) The biopsy report noted that: "No keloid is seen. The histologic differential diagnosis

includes bacterial folliculitis, a lesion of foliculitis decalvans, and tinea capitis. A special stain (PAS stain) is negative for fungal hyphae." (Id.)

    C. Analysis

The documents provided by plaintiff demonstrate that plaintiff has a history of chronic back pain and keloids. Based on these records, the court assumes, without deciding, that plaintiff's conditions constituted serious medical needs.

Medical records provided by plaintiff reflect that Dr. Reddy provided medical treatment for both plaintiff's keloid bumps and his back pain on February 10, 2011. Dr. Reddy noted that plaintiff was prescribed Ibuprofen for his lower back pain. In addition, an x-ray of plaintiff's lower back was ordered on February 10, 2011. Also, plaintiff's right forearm was diagnosed with folliculitis, and plaintiff was advised to keep the area clean and dry, and to follow-up if it got worse. (ECF No. 25 at 30.) Plaintiff contends that the only course of treatment for his keloids from Dr. Reddy was her advice about the bleeding -- that plaintiff should keep it clean and dry. (ECF No. 32 at 5.) However, the site did not appear infected, so no medication was required. Although Dr. Reddy may not have given plaintiff the treatment he wanted, Dr. Reddy's assessment that plaintiff's occipital keloid required "conservative treatment" was not unreasonable in light of plaintiff's position that the recently-administered cortisone shots made the keloids worse. The medical record does not evidence deliberate indifference, and plaintiff's allegation that Dr. Reddy's treatment on February 10, 2011, was insufficient represents a difference of opinion that does not rise to the level of a constitutional violation. Franklin, 662 F.2d at 1344.

Contrary to plaintiff's allegations in his second amended complaint, Dr. Reddy's treatment on March 4, 2011, does not constitute deliberate indifference to plaintiff's serious medical needs. Rather, the record reflects that Dr. Reddy examined plaintiff and provided medical care for plaintiff's complaints. Plaintiff alleges no facts to support his claims that Dr. Reddy "refused to treat his worsening medical condition," "ridiculed Plaintiff," and "ignored his pain and suffering." (ECF No. 25 at 4.) These bald and conclusory statements are insufficient to satisfy Iqbal. Moreover, the medical records refute such statements, as set forth above. Dr.

1  Reddy's notes confirm that plaintiff was instructed in handwashing and medical compliance, the
2  keloid area did not appear to be infected, and the doctor found plaintiff's condition did not affect
3  his activities of daily living  To the extent plaintiff argues that he should have received laser
4  surgery, such an argument constitutes a mere difference of opinion concerning medical treatment,
5  which does not rise to the level of a constitutional violation.  Franklin, 662 F.2d at 1344.

6  Plaintiff further contends that in the April 27, 2011 administrative appeal, Dr. Reddy alleged that plaintiff stated the occipital keloid had disappeared and that plaintiff wanted to cancel the minor surgery appointment scheduled to remove the cyst.  (ECF No. 25 at 4.)  Plaintiff claims this is not true, and that this "was an attempt to misdiagnose his condition yet again."  (Id.)  However, as set forth above, the administrative appeal reflects that the minor surgery had been scheduled to address a cyst in plaintiff's "left axilla" or forearm, not his occipital keloid.  (ECF No. 8 at 18, 23.)  None of the medical records provided by plaintiff demonstrate that Dr. Reddy claimed the occipital keloid had "disappeared."  Thus, plaintiff's claim is unavailing.

14  Taking Dr. Reddy's care and treatment on these three occasions together, plaintiff alleges no facts demonstrating that Dr. Reddy knew that plaintiff's occipital keloid posed an excessive risk to plaintiff, or that her alleged failure to refer plaintiff to a specialist would pose an excessive risk to plaintiff, or cause his condition to worsen.  Rather, the record reflects that plaintiff suffered a long history of keloids, and that Dr. Reddy took a conservative approach in plaintiff's treatment.  Dr. Reddy examined plaintiff on each occasion, and found no infection, and addressed plaintiff's other complaints as well.  Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety.  Farmer, 511 U.S. at 837.  In order to know of the excessive risk, it is not enough that Dr. Reddy was aware of facts from which such an inference could be drawn that a substantial risk of serious harm existed, but Dr. Reddy had to draw that inference.  Plaintiff alleges no facts suggesting that Dr. Reddy drew such an inference.  In light of the documents provided by plaintiff, the undersigned cannot find that Dr. Reddy's conservative approach constitutes deliberate indifference.

28  ////

Plaintiff now contends that Dr. Reddy misdiagnosed plaintiff's skin condition as a keloid rather than folliculitis. However, such claim is unavailing. "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton, 622 F.2d at 460 (citing Estelle, 429 U.S. at 105-06: "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.") Here, plaintiff alleges no facts demonstrating that Dr. Reddy was aware that plaintiff suffered from folliculitis, but intentionally failed to treat it. The records provided by plaintiff demonstrate that at least two doctors, including Dr. Joseph Torruella, and two nurses, believed that plaintiff suffered from recurring keloids. Indeed, even plaintiff reported that he had suffered from keloids for years. The fact that other medical professionals diagnosed plaintiff's condition as keloids rather than folliculitis supports this court's view that Dr. Reddy reasonably believed plaintiff suffered from keloids.

In his opposition, plaintiff further claims that Dr. Reddy failed to provide him treatment for the ruptured folliculitis. (ECF No. 29 at 9.) However, the record reflects that Dr. Reddy diagnosed plaintiff as having an occipital keloid, which was not infected, and in any event a misdiagnosis fails to state a cognizable civil rights claim. Moreover, even if Dr. Reddy had diagnosed plaintiff's occipital keloid as folliculitis, the record reflects that Dr. Reddy treated plaintiff's right forearm folliculitis by advising plaintiff to keep the area clean and dry, and to follow-up if the condition got worse, and that no further diagnosis was needed. (ECF No. 25 at 30.) Thus, the documents provided by plaintiff raise an inference that even had Dr. Reddy diagnosed the occipital keloid as folliculitis, she would have prescribed the same treatment as prescribed for plaintiff's forearm.

It appears that plaintiff also contends that Dr. Reddy's alleged failure to treat plaintiff's occipital keloid caused his condition to worsen, as evidenced by his November 6, 2012 diagnosis of ruptured folliculitis. In his opposition, plaintiff claims that he now suffers from a "diffuse reaching fibrosis on the back of his scalp the size of an orange, which is acute, infected, and [has] chronic inflammation." (ECF No. 29 at 3.) Plaintiff claims that despite Dr. Reddy's "careful observation that plaintiff showed no signs of active infection, 14 months later," a biopsy ordered

11

by Dr. Lee showed the bacterial folliculitis diagnosis.  (ECF No. 29 at 4.)

However, plaintiff fails to allege facts demonstrating that Dr. Reddy was aware that plaintiff's condition would worsen, or, as set forth above, that Dr. Reddy was responsible for plaintiff's medical care beyond her evaluations in connection with plaintiff's appeal.  The documents provided by plaintiff demonstrate that when plaintiff presented to clinic after April 27, 2011, he was seen by medical staff other than Dr. Reddy, and plaintiff was subsequently provided creams and other medical treatment for his occipital keloids by medical staff other than Dr. Reddy.  Plaintiff alleges no facts demonstrating a link or connection between plaintiff's medical care after Dr. Reddy interviewed plaintiff in connection with his appeal in April of 2011.  Plaintiff alleges no facts demonstrating that Dr. Reddy was aware that plaintiff's keloid condition worsened, and points to no facts suggesting Dr. Reddy should have known plaintiff's condition would worsen more than a year later.

Finally, the medical records suggest that plaintiff's keloid became infected long after Dr. Reddy last examined plaintiff.  The medical records confirm that at the time Dr. Reddy examined plaintiff, the keloid did not appear infected.  Plaintiff concedes that Dr. Reddy advised him to keep the area clean and dry.  (ECF No. 29-1 at 2.)  Dr. Reddy instructed plaintiff on the importance of handwashing.  (ECF No. 25 at 31.)  Over a year later, plaintiff's keloid area started itching, and on May 26, 2012, plaintiff presented at clinic stating the area was itching and he had started to scratch the area, causing it to bleed.  (ECF No. 25 at 36.)  Plaintiff was scratching the area with his comb during this medical visit.  Plaintiff denied having any pain.  It was not until November 6, 2012, that plaintiff was diagnosed as having the bacterial folliculitis, over a year and a half after plaintiff last saw Dr. Reddy.  Given that plaintiff's keloid area did not appear infected when Dr. Reddy last examined plaintiff, and plaintiff was not complaining of itching until May of 2012, long after Dr. Reddy last saw plaintiff, plaintiff has failed to establish a link or connection between Dr. Reddy and any subsequent infection or delay in treatment.

With regard to plaintiff's allegations concerning his back pain, contrary to plaintiff's allegation that he was not prescribed pain medication until May 18, 2011, the record reflects plaintiff was prescribed Ibuprofen for pain.  In his administrative appeal, plaintiff did not state

that the Ibuprofen was not working for his back pain.  It was not until May 16, 2011, when plaintiff completed a health care services request form, that he claimed the Ibuprofen was not working.  (ECF No. 25 at 34.)  At that time, plaintiff was seen by the triage nurse, and on May 23, 2011, Dr. Jeu wrote plaintiff a prescription for Naproxin and Methocarbamol for plaintiff's lower back pain.  (ECF No. 25 at 14, 34.)  Plaintiff alleges no facts demonstrating that Dr. Reddy was aware of the May 16, 2011 request, or that the Ibuprofen was not working for plaintiff's lower back pain.  Plaintiff alleges no facts demonstrating that Dr. Reddy was responsible for plaintiff's medical care following Dr. Reddy's involvement in the appeal process.  Moreover, subsequently, on May 26, 2012, plaintiff sought refill of the Ibuprofen for plaintiff's "severe back pain."  (ECF No. 25 at 36.)

The records provided by plaintiff demonstrate that plaintiff was initially prescribed with Ibuprofen for pain, and that when he reported it was not working, he was prescribed other medication for his back pain.  The medical records provided by plaintiff refute his claim that he was not provided medication for his lower back pain.  To the extent plaintiff argues that Dr. Reddy should have prescribed plaintiff stronger pain medication, absent additional facts not alleged here, such claim rises only to the level of a difference of opinion.  Plaintiff does not contend that he requires back surgery that he has not been provided.

For all of the above reasons, defendant's motion to dismiss plaintiff's claims against defendant Dr. Reddy is granted, and this action is closed.

VI. Conclusion

In accordance with the above, IT IS HEREBY ORDERED that defendant Reddy's motion to dismiss (ECF No. 26) is granted, and this action is closed.

Dated:  December 23, 2013

/john1843.mtd2

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

13